Slip Op. 11-96

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LIBERTY FROZEN FOODS PVT., LTD., *et al.*,<br><br>        Plaintiffs,<br><br>        - v -<br><br>UNITED STATES,<br><br>        Defendant,<br><br>        - and -<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE, *et al.*, | Before: Pogue, Chief Judge<br><br>Consol.[1] Court No. 10-00231 |

OPINION

[Remanding to the Department of Commerce for reconsideration of Plaintiffs' dumping margin calculation in administrative review of antidumping duty order.]

Dated: August 3, 2011

    Kutak Rock LLP (Lizbeth R. Levinson and Ronald M. Wisla) for the Plaintiffs.

    Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Particia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Joshua E. Kurland) for the Defendant.

    Picard, Kentz & Rowe, LLP (Nathaniel J. M. Rickard, Andrew W. Kentz, Jordan C. Kahn and Kevin M. O'Connor) for Defendant-Intervernor Ad Hoc Shrimp Trade Action Committee.

---

    [1] This action was consolidated with Court No. 10-00237, which has been dismissed. Order, Ad Hoc Shrimp Trade Action Committee v. United States, No. 10-00237 (CIT Mar. 1, 2011) (USCIT Rule 41(a)(1)(A)(ii) dismissal).

    Stewart and Stewart (<u>Geert M. De Prest</u> and <u>Elizabeth J. Drake</u>) and <u>Leake & Andersson, LLP</u> (<u>Edward T. Hayes</u>) for Defendant-Intervenor American Shrimp Processors Association.

    **Pogue, Chief Judge**: In this action, Plaintiffs seek review of the United States Department of Commerce's ("Commerce" or the "Department") Final Results in the fourth administrative review of the antidumping duty order covering certain frozen warmwater shrimp from India.[2] Specifically, Plaintiffs challenge Commerce's inclusion of, and method of calculation for, their bad debt expenses in the cost of sales at issue in this review. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006).[3]

    As explained in detail below, the court concludes that, although Commerce correctly included the contested bad debt expenses in its determination, Commerce's calculation of Plaintiffs' specific expenses was arbitrary, and thus contrary to

---

[2] See <u>Certain Frozen Warmwater Shrimp from India</u>, 75 Fed. Reg. 41,813 (Dep't Commerce July 19, 2010) (final results of antidumping duty administrative review, partial rescission of review, and notice of revocation of order in part) ("<u>Final Results</u>"), and accompanying Issues & Decision Memorandum, A-533-840, ARP 08-09 (July 13, 2010), Admin. R. Pub. Doc. 310 ("<u>I & D Mem.</u>") (adopted in <u>Final Results</u>, 75 Fed. Reg. at 41,815). Plaintiffs were respondents in the review.

[3] Jurisdiction under 28 U.S.C. § 1581(c) attaches where, as here, an action is brought under Section 516A(a)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2) (2006) (providing a cause of action for, *inter alia*, challenges to final determinations by Commerce in administrative reviews of antidumping duty orders). All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2006 edition.

Consol. Court No. 10-00231                                          Page 3

law.  This issue is therefore remanded to the agency for reconsideration.

**BACKGROUND**

Commerce calculates dumping margins by comparing export prices to the subject merchandise's normal value in the producer's home or comparison market.[4]  Among the calculations used to arrive at the appropriate normal value is the Department's calculation of a mandatory[5] respondent's selling

---

[4] Goods are considered "dumped" when they are sold at less than fair value ("LTFV"), 19 U.S.C. § 1677(34) – that is, when "the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). "Normal value" is "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price . . ., at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(A) & (B)(i).  "Export price" is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under [19 U.S.C. § 1677a(c)]." Id. at § 1677a(a).  Constructed export price is not applicable here.

[5] See 19 U.S.C. § 1677f-1(c)(2)(B) ("If it is not practicable to make individual weighted average dumping margin determinations [] because of the large number of exporters or producers involved in the investigation or review, [Commerce] may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to . . . exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.").  When the Department limits its examination pursuant to 19 U.S.C. § 1677f-1(c)(2), the

expenses during the period of review ("POR").[6]

Within the POR at issue here[7] – in March, 2008 – one of the companies comprising the Liberty Group, Liberty Frozen Foods, Pvt., Ltd.("LFF"), wrote off the value of a sale for which full payment had not been received (the "write-off").[8] The Liberty Group did not, however, report the value of this bad debt write-off as part of its POR costs. See Supplemental Section D Resp. Of

---

respondents selected for individual review are referred to as "mandatory respondents." E.g., Certain Frozen Warmwater Shrimp from India, 75 Fed. Reg. 12,175, 12,176 (Dep't Commerce Mar. 15, 2010) (preliminary results of antidumping administrative review, partial rescission of review, notice of intent to rescind review in part, and notice of intent to revoke order in part) ("Prelim. Results").

The Department selected the Plaintiffs, collapsed into a single entity (the "Liberty Group"), for individual review as a mandatory respondent. Final Results, 75 Fed. Reg. at 41,813 & n.2.

[6] See 19 U.S.C. § 1677b(a)(6)(C)(iii) (Commerce may make adjustments to normal value to account for differences in the circumstances of sales in the U.S. and foreign markets); 19 C.F.R. § 351.410(b) (selling expenses relevant to determination of differences in circumstances of sales) & (c) (defining "direct selling expenses" as "expenses, such as commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question"). See also 19 C.F.R. § 412(f)(2) (defining "indirect selling expenses" as "selling expenses, other than direct selling expenses or assumed selling expenses (see § 351.410), that the seller would incur regardless of whether particular sales were made, but that reasonably may be attributed, in whole or in part, to such sales").

[7] The POR was February 1, 2008 through January 31, 2009. Final Results, 75 Fed. Reg. at 41,814.

[8] See Mem. of Points & Auths. in Supp. of Pls.' 56.2 Mot. for J. on Agency R. ("Pls.' Br.") 3-4.

Consol. Court No. 10-00231                                    Page 5

[LFF], A-533-840, ARP 08-09 (Oct. 7, 2009), Admin. R. Con. Doc. 28 [Pub. Doc. 219] ("LFF's Supp. Sec. D Resp.") Ex. 3.2.6 (identifying the write-off as an exclusion from its reported costs). In explaining this omission, the Liberty Group stated that the write-off was "related to [an] earlier year." Id.

The Department then requested from the Liberty Group a detailed explanation regarding this write-off.[9] Responding to this request, the Liberty Group submitted an unsupported statement that the write-off relates to a quality claim from "[a] buyer" of "certain sales" in financial year 2003-2004. 2d Supplemental Section D Resp. of [LFF], A-533-840, ARP 08-09 (Feb. 4, 2010), Admin. R. Con. Doc. 49 [Pub. Doc. 270] 3.[10]

---

[9] ITA 2d Supplemental Section D Questionnaire to Liberty Group, A-533-840, ARP 08-09 (Jan. 7, 2010), Admin. R. Con. Doc. 44 [Pub. Doc. 258] ¶ 2(b) ("With regard to [the write-off][,] you state that this expense was excluded because it relates to 'earlier year' (exhibit 3.2.6). Please explain in detail what this expense represents, how it was recorded in the earlier year, and why it should be excluded from the reported costs even though it was recorded on the current financial statements as [a] current period expense. Revise your response if necessary." (quoting LFF's Supp. Sec. D Resp., Admin. R. Con. Doc. 28 [Pub. Doc. 219] Ex. 3.2.6)).

[10] ("The quality claim relates to financial year 2003-04. The buyer concerned did not make part of the payment on certain sales in that year on grounds of certain quality deficiencies. The company did not accept the claim; consequently the amount in dispute remained in receivables account. However after discussions and in order to sustain business relationship it was decided towards end of 2007-08 that the buyer's claim should be accepted. Therefore the amount was written off from receivables during 2007-08.").

Based on this record, the Department determined it appropriate to treat the write-off as part of LFF's POR costs. <u>Prelim. Results</u>, 75 Fed. Reg. at 12,184 (citing Liberty Group Sales Calc. Mem., A-533-840, ARP 08-09 (Mar. 8, 2010), Admin. R. Con. Doc. 59 [Pub. Doc. 288]). The Liberty Group objected, arguing that the write-off should not be included in LFF's POR costs because it relates to sales made prior to the POR. <u>I & D Mem.</u> Cmt. 5 at 17. In the alternative, the Liberty Group argued that, because the POR spans over two of LFF's financial years,[11] the write-off should be pro-rated, such that only an amount proportionate to the overlap between the financial year in which it was recorded and the POR is included in the calculation of LFF's POR costs. <u>Id.</u> at 18.[12]

---

[11] <u>See</u> [LFF's] Sections B & C Resp., A-533-840, ARP 08-09 (July 7, 2009), Admin. R. Con. Doc. 10 [Pub. Doc. 174] Ex. B-9 ("The POR spans over two financial years: 2007-08 and 2008-09. The sales for 2 months from 1st February 2008 to 31st March 2008 in first financial year and the sales for 10 months from 1st April 2008 to 31st January 2009 in second financial year are combined to arrive at sales for this POR.").

[12] <u>See also</u> [Liberty Group's] Comments on Preliminary Results, A-533-840, ARP 08-09 (Apr. 21, 2010), Admin. R. Con. Doc. 67 [Pub. Doc. 298] ("<u>Liberty Group Admin. Case Br.</u>"). Because the Liberty Group presented no other arguments to the agency with regard to this write-off, <u>see</u> <u>id.</u>, the court does not consider Plaintiffs' additional arguments, Pls.' Br. 17-19. <u>See</u> 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."); <u>Corus Staal BV v. United States</u>, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("[A]bsent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."); <u>Ad Hoc Shrimp Trade Action</u>

In its Final Results, the Department determined to continue to treat the entire write-off as part of LFF's POR costs. See 75 Fed. Reg. at 41,815; I & D Mem. Cmt. 5.  The Liberty Group now challenges Commerce's decision.

**STANDARD OF REVIEW**

Under its familiar standard of review,"[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938); Gallant Ocean (Thail.) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (same), "taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Thus, the

---

Comm. v. United States, __ CIT __, 675 F. Supp. 2d 1287, 1300 (2009) ("The failure to include an argument in a case brief is a failure to exhaust administrative remedies with respect to that argument because it deprives Commerce of an opportunity to consider the matter, make its ruling, and state the reasons for its action.") (internal quotation and alteration marks and citation omitted).

substantial evidence standard of review "can be translated roughly to mean 'is [the determination] unreasonable?'" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting SSIH Equip. SA v. U.S. ITC, 718 F.2d 365, 381 (Fed. Cir. 1983)).

A determination, finding, or conclusion is not in accordance with law if, *inter alia*, it is arbitrary. Pakfood Pub. Co. v. United States, __ CIT __, 724 F. Supp. 2d 1327, 1334-35 (2010) (citing SKF USA Inc. v. United States, 263 F.3d 1369, 1378, 1382 (Fed. Cir. 2001) and Nat'l Fisheries Inst. v. United States, __ CIT __, 637 F. Supp. 2d 1270, 1282 (2009)).

## DISCUSSION

I. Whether Commerce Should Have Excluded LFF's Write-Off From Plaintiff's Dumping Margin Calculation In This Review

Plaintiffs argue that, pursuant to the Department's practice, the cost of the write-off at issue should not have been included within the dumping margin calculation for this POR, because the write-off relates to sales made prior to the POR. Pls.' Br. 11-12. The court disagrees.

First, the prior Commerce determinations that Plaintiffs cite in support of this argument are inapposite – in no case did the Department exclude from its calculations the cost of an

ordinary write-off recorded during the POR.[13]  Second, in each case, the Department's dumping margin calculation included all ordinary expenses for bad debt written off during the POR.[14]

---

[13] See Pls.' Br. 11-13 (citing Stainless Steel Plate in Coils from the Republic of Korea and Stainless Steel Sheet and Strip in Coils from the Republic of Korea, 66 Fed. Reg. 45,279 (Dep't Commerce Aug. 28, 2001) (notice of amendment of final determinations of sales at less than fair value) ("Plate and Sheet from Korea"); Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 66 Fed. Reg. 18,747 (Dep't Commerce Apr. 11, 2001) (final results of antidumping administrative review) ("Pipe from Korea"); Stainless Steel Sheet and Strip in Coils from the Republic of Korea, 64 Fed. Reg. 30,664 (Dep't Commerce June 8, 1999) (notice of final determination of sales at less than fair value) ("Sheet from Korea"); and Foam Extruded PVC and Polystyrene Framing Stock From the United Kingdom, 61 Fed. Reg. 51,411, 51,417 (Dep't Commerce Oct. 2, 1996) (notice of final determination of sales at less than fair value) ("Stock from U.K.")).

[14] Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, Issues & Decision Mem., A-589-809, ARP 98-99 (Apr. 5, 2001) (adopted in Pipe from Korea, 66 Fed. Reg. 18,747) ("Pipe from Korea I & D Mem.") Cmt. 10 (including bad debt expenses recorded during the relevant POR within the dumping margin calculation for that POR); Sheet from Korea, 64 Fed. Reg. at 30,674 (same); Stock from U.K., 61 Fed. Reg. at 51,417 (same); see also Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, Issues & Decision Mem., A-589-809, ARP 07-08 (June 14, 2010) (adopted in 75 Fed. Reg. 34,980, 34,981 (Dep't Commerce June 21, 2010) (final results of antidumping duty administrative review) ("Pipe from Korea II") (relied on in Pls.' Br. 9 & 15)) ("Pipe from Korea II I & D Mem.") Cmt. 4 at 21 (same).
   See also Plate and Sheet from Korea, 66 Fed. Reg. at 45,280 (amending certain prior determinations to exclude bad debt expenses in response to a World Trade Organization panel's ruling that "the extraordinary bad debt expenses in these cases could not reasonably have been anticipated"); compare with Liberty Group Admin. Case Br., Admin. R. Con. Doc. 67 [Pub. Doc. 298] 3 (explaining that the write-off at issue was recorded in accordance with LFF's "normal accounting practices" for dealing with non-received payment, and noting that LFF has written-off similar bad debt "in a few cases").

Consol. Court No. 10-00231                                               Page 10

Plaintiffs emphasize that, in two prior situations, the Department included the cost of certain write-offs within the margin calculation as direct, rather than indirect, selling expenses.[15]  But Plaintiffs do not argue that their write-off should have been included in the margin calculation as a direct selling expense.[16]  Instead, Plaintiffs contend that, notwithstanding the fact that the bad debt was a foreseeable

---

See also Stephen M. Bragg, GAAP 2011: Interpretation and Application of Generally Accepted Accounting Principles 193 (2010) ("The recording of a valuation allowance for anticipated uncollectible amounts is almost always necessary.  The *direct write-off method*, in which a receivable is charged off only when it is clear that it cannot be collected, is unsatisfactory since it overstates assets and also results in a mismatching of revenues and expenses."); id. at 396 ("The standard accounting treatment for uncollectible accounts is to accrue a bad debt loss in the year of sale by estimating the amount expected to be uncollectible.").

[15] Pls.'s Br. 11-12 (citing Sheet from Korea, 64 Fed. Reg. 30,664; Stock from U.K., 61 Fed. Reg. 51,411).

[16] See Liberty Group Admin. Case Br., Admin. R. Con. Doc. 67 [Pub. Doc. 298] 4 ("[The write-off] should not be included . . . in any calculation in this POR."); Pls.' Br. 7-8 ("The bad debt expense . . . should not have been attributed to this POR.") & 14 ("[T]he bad debt [expense] . . . should be excluded [from the dumping margin calculation] as a pre-POR direct expense.").  Moreover, the Liberty Group "acknowledges that the write-off at issue could not be treated as a direct offset to any POR sales because it related to a sale made in [a] prior period." I & D Mem. Cmt. 5 at 18; see also Request for Information, A-533-840, ARP 08-09 (May 14, 2009), Admin. R. Pub. Doc. 145, App. I (Glossary of Terms) at I-6 (explaining that "direct expenses" are those that are traceable "to sales of the merchandise under review").

expense written off during the POR,[17] the Department should have entirely disregarded this expense when calculating LFF's dumping margin. Pls.' Br. 7-8, 14.

Plaintiffs, however, have cited no statutory or regulatory provision, nor any agency practice – and the court is not aware of any – to support their contention that Commerce is required to exclude from its calculations ordinary costs recorded during the POR if they relate to pre-POR sales.  To the contrary, the Department's prior practice has been that "expenses booked inside the [POR], but incurred before the [POR], are included in selling expenses if they are recurring expenses, as opposed to an extraordinary charge." Saccharin from the People's Republic of China, Issues & Decision Mem., A-570-878, Investigation (May 20, 2003) (adopted in 68 Fed. Reg. 27,530 (Dep't Commerce May 20, 2003) (final determination of sales at less than fair value)) ("Saccharin from PRC I & D Mem.") Cmt. 10 at 20.[18]

---

[17] Compare with Plate and Sheet from Korea, 66 Fed. Reg. at 45,280 (excluding bad debt write-offs from dumping margin calculation where the write-offs were not foreseeable); Stainless Steel Sheet and Strip from the Republic of Korea, Issues & Decision Mem., A-580-834, ARP 99-00 (Dec. 6, 2001) (adopted in 66 Fed. Reg. 64,950 (Dep't Commerce Dec. 17, 2001) (final results and partial rescission of antidumping duty administrative review)) Cmt. 2 (excluding bad debt write-off from dumping margin calculation where the write-off was recorded during the investigation underlying the antidumping duty order, prior to the POR in question).

[18] See also I & D Mem. Cmt. 5 at 20 ("[I]t is the Department's practice to include . . . a write-off of [bad] debt

In this case, the Department concluded "that LFF's bad debt expense, which LFF identifies as part of its 'normal accounting

---

in [the dumping margin] calculations during the period in which the write-off was recorded in the company's accounting system." (citing Saccharin from PRC I & D Mem. Cmt. 10)); Def.'s Resp. to Pls.' Rule 56.2 Mot. for J. Upon Agency R. 9-10 ("[A]s Commerce explained in the final results, the agency's practice is to include bad debt written-off during the period of review in its calculation of a respondent's dumping margin even if the bad debt relates to a sale that occurred before the review period." (citing I & D Mem. Cmt. 5 at 20; Oil Country Tubular Goods, Other Than Drill Pipe, from Korea, Issues & Decision Mem., A-580-825, ARP 03-04 (Mar. 6, 2007) (adopted in 72 Fed. Reg. 9,924 (Dep't Commerce Mar. 6, 2007) (final results of antidumping administrative review)) Cmt. 2 at 8 ("[I]t is the Department's normal practice to include bad debts written off during the POR in the indirect selling expense calculation because they are usually related to sales pertaining to all markets. Therefore, the Department finds it is appropriate to include [a respondent's] bad debt expenses as part of [its] selling expenses for the final results." (citing Stainless Steel Bar from India, Issues & Decision Mem., A-533-810, ARP 01-02 (Aug. 4, 2003) (adopted in 68 Fed. Reg. 47,543 (Dep't Commerce Aug. 11, 2003) (final results of antidumping administrative review)) Cmt. 7 & Stainless Steel Sheet and Strip in Coils From the Republic of Korea, Issues & Decision Mem., A-580-834, ARP 00-01 (Feb. 2003) (adopted in 68 Fed. Reg. 6,713 (Dep't Commerce Feb. 10, 2003) (final results and partial rescission of antidumping duty administrative review)) Cmt. 7)) & Glycine from India, Issues & Decision Mem., A-533-845, Investigation (Mar. 28, 2008) (adopted in 73 Fed. Reg. 16,640 (Dep't Commerce Mar. 28, 2008) (notice of final determination of sales at less than fair value)) Cmt. 2 at 3 ("The Department normally classifies bad-debt expense as indirect selling expenses because those expenses relate to the sales of a company. . . . [Because] [the respondent] employed the direct write-off method for its doubtful accounts (i.e., it recognizes bad-debt expenses only when accounts are deemed uncollectible)[,] . . . [the Department is] including [the bad debt expenses] in the calculation of the rate for indirect selling expenses." (citing Coated Free Sheet Paper from the Republic of Korea, 72 Fed. Reg. 60,630 (Dep't Commerce Oct. 25, 2007) (notice of final determination of sales at less than fair value)))).

practices' and similar to 'discounts [given] in a few other cases,' are not extraordinary expenses which the Department would disregard from its margin calculations." I & D Mem. Cmt. 5 at 21 (quoting Liberty Group Admin. Case Br., Admin. R. Con. Doc. 67 [Pub. Doc. 298] 3).  On the record of this case, this conclusion is not unreasonable.

Accordingly, because the Department's methodology applied to the bad debt write-off at issue was neither contrary to statute nor to the agency's regulations or prior practice; and because a reasonable reading of the record supports the Department's conclusions in applying its methodology to the facts of this case, the court upholds Commerce's decision not to exclude LFF's March 2008 write-off when calculating Plaintiffs' dumping margin for this POR.

As explained below, however, the court cannot uphold, in the absence of further explanation, Commerce's decision not to pro-rate the value of the write-off, so as to include in its calculations solely the amount proportionate to the overlap between the POR and the fiscal year in which the write-off was recorded.  As explained below, under the circumstances of this case, and in light of the Department's prior practice under similar circumstances, the decision not to pro-rate the write-off is, in the absence of additional explanation, arbitrary and therefore contrary to law.

## II. Whether LFF's Write-Off Should Have Been Pro-rated

Plaintiffs argue that, if included within LFF's selling expenses for this POR, the write-off at issue should have been pro-rated, on a monthly basis over the course of the fiscal year in which it was recorded, such that only the months in which LFF's fiscal year overlapped with the POR should have been considered in the dumping calculation for this POR. Pls.' Br. 14-18.

In response, the Department relies on Saccharin from PRC and contends that, "[a]bsent a provision for bad debt expense recorded by the company, it is the Department's practice to include the full amount of a write-off of such debt in [its] calculations during the period in which the write-off was recorded in the company's accounting system." I & D Mem. Cmt. 5 at 20 (citing Saccharin from PRC I & D Mem. Cmt. 10[19]) (footnote omitted).  The court finds this explanation to be incomplete, and therefore concludes it to be insufficient.

The problem with the Department's line of reasoning here is that Saccharin from PRC – the sole example of agency practice that Commerce relies upon with regard to this issue – appears to have applied precisely the methodology that Plaintiffs asked the

---

[19] The Department's characterization of Saccharin from PRC notwithstanding, the court could find no evidence that "a provision for bad debt expense recorded by the company" played any dispositive role in Saccharin from PRC.

agency to apply in this case.  In Saccharin from PRC, a respondent's fiscal year overlapped with the relevant POR by the fiscal year's first six months.  Although the company recorded a certain bad debt write-off at the end of its fiscal year – outside of the POR – the Department determined that "this choice was made solely as a matter of completing the books for the year," Saccharin from PRC I & D Mem. Cmt. 10 at 20 n.5, and therefore "divide[d] these expenses by two and attribute[d] half to the [relevant POR] (the first half of the calendar year)." Id.

Thus it appears that the Department would like to have it both ways: If the bad debt expense is recorded at the end of a company's fiscal year, and that month falls within the POR, the Department includes the full amount of the expense as falling within the POR, regardless of overlap between fiscal year and POR. See I & D Mem. Cmt. 5 at 21. But if the bad debt expense is recorded at the end of a company's fiscal year, and that month falls outside the POR, the Department does not consider the full amount of the expense to fall outside the POR, but rather pro-rates it, and includes an amount proportional to the overlap between fiscal year and POR. See Saccharin from PRC I & D Mem. Cmt. 10 at 20 n.5.[20]  Without more explanation from the agency, this is an unreasonable inconsistency in the Department's

---

[20] See also Pipe from Korea II I & D Mem. Cmt. 4 at 21-22 (same).

methodology.

Accordingly, because an unexplained inconsistency in the application of a methodology is unlawful agency action, see SKF, 263 F.3d at 1382; Pakfood, __ CIT at __, 724 F. Supp. 2d at 1334,[21] this case is remanded to the Department for reconsideration of its decision to not pro-rate LFF's March 2008 bad debt write-off so as to include solely such portion thereof as is properly attributable to the POR.  On remand, the Department shall specifically explain why its failure to pro-rate this write-off is not arbitrary in light of its determination under apparently like factual circumstances in Saccharin from PRC, 68 Fed. Reg. 27,530; Saccharin from PRC I & D Mem. Cmt. 10 at 20 n.5, and Pipe from Korea II, 75 Fed. Reg. 34,980; Pipe from Korea II I & D Mem. Cmt. 4 at 21-22, or otherwise reconsider its decision.

## CONCLUSION

For all of the foregoing reasons, the Department's Final Results, 75 Fed. Reg. 41,813, are remanded to the agency, for reconsideration and further explanation or amendment, in accordance with this opinion.  Specifically, the Department shall reconsider, and further explain or amend, its decision to

---

[21] See also Martin v. Franklin Capital Corp., 546 U.S. 132, 139 (2005) ("[L]imiting [agency] discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike.").

consider the full amount of LFF's March 2008 bad debt write-off when calculating Plaintiffs' dumping margin in this review.

Commerce shall have until October 3, 2011 to complete and file its remand redetermination. Plaintiffs shall have until November 2, 2011 to file comments. Defendant and Defendant-Intervenors shall have until November 17, 2011 to file any reply.

It is **SO ORDERED**.

                                                        /s/ Donald C. Pogue
                                                     Donald C. Pogue, Chief Judge

Dated:    August 3, 2011
            New York, N.Y.